```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
EBONE HARRIS,

                Plaintiff,                              15-CV-6341 (NG) (JO)

        -against-
                                                        OPINION AND ORDER
CITY OF NEW YORK, NYPD DETECTIVES
DAVID LUPPINO, JOHN BROOKS, and
ARTHUR TRUSCELLI, SGT. VICTOR
BRUNO, SGT. NIKOLAOS STEFOPOULOS,

                Defendants.
-----------------------------------------------------------x
```

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ APR 27 2018 ★
BROOKLYN OFFICE

**GERSHON, United States District Judge:**

Plaintiff Ebone Harris brings this action pursuant to 42 U.S.C. § 1983 and the New York City Human Rights Law, alleging a number of civil rights claims. At the pre-motion conference held on November 8, 2017, plaintiff agreed to dismiss her false arrest and false imprisonment claims, her claim alleging municipal liability against the City of New York, and all claims against Chief of Detectives David Boyce, NYPD Borough Commander Edward Delatore, 122nd Precinct Commander Ebony Washington, 120th Police Precinct Commander Robert Bocchino, and all John and Jane Doe defendants. By subsequent letter dated December 7, 2017, plaintiff further agreed to dismiss her 42 U.S.C. § 1985 conspiracy claim.

Defendants now move for summary judgment on plaintiff's remaining claims, which are: (1) a § 1983 claim for deliberate indifference to her safety in violation of the Due Process Clause of the Fourteenth Amendment; (2) a § 1983 claim for deliberate indifference to her need for medical treatment in violation of the Due Process Clause of the Fourteenth Amendment; and (3) a claim that defendants discriminated against plaintiff on the basis of her race in violation of N.Y.C.

1

Admin. Code § 8-107(4). For the reasons set forth below, defendants' motion is granted in part and denied in part.

I. **Facts**

Except as otherwise noted, the facts are undisputed for purposes of this motion. Preliminarily, in addition to her deposition and 50-H testimony, plaintiff has submitted an affidavit with her opposition to defendants' summary judgment motion which defendants ask me not to consider at all. Upon careful review of her testimony and affidavit, I conclude that—with the exception of two allegations made in the affidavit which directly contradict her deposition and will not be considered (*see* footnotes two and four)—the allegations in the affidavit are additional, and not contradictory, to her testimony and can be considered. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *see also Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).

On November 8, 2014, at approximately 6:00 p.m., plaintiff, an African-American woman, was driving on Staten Island with her 14-year-old cousin[1] in the car, when her vehicle was stopped by NYPD Detectives Luppino and Brooks, who are white. The facts which led the detectives to place plaintiff under arrest are not before me, but plaintiff was handcuffed and arrested, and she was later arraigned on charges of reckless driving, endangering the welfare of a child, and possession of marijuana. Plaintiff ultimately pled guilty to disorderly conduct and does not argue that defendants lacked probable cause to arrest her. Plaintiff, however, does take issue with the manner in which she was arrested and her treatment while in custody.

Plaintiff alleges that during the arrest, the detectives drew their guns and pointed them at both plaintiff's face and her cousin's face. Additionally, after placing plaintiff in handcuffs, one

---

[1] This person is occasionally referred to in plaintiff's papers as plaintiff's niece but plaintiff's own affidavit refers to her as a cousin.

of the male detectives put his hand in plaintiff's front pants pocket, physically touching her leg.[2] After the search, plaintiff told her cousin to call plaintiff's mother, but one of the detectives yelled at her that if she told anyone he would "place her little black ass in cuffs and drag her little ass to jail." A female officer was present and asked the arresting officers if they wanted her to transport plaintiff back to the precinct, but the officers said no. Detectives Stefopoulos[3] and Truscelli arrived in an NYPD prisoner van to pick up the plaintiff, and an unspecified NYPD officer placed plaintiff into the back of the van. Defendant Bruno was also present and was supervising the operation.

After she was placed in the van, plaintiff was still handcuffed with her hands behind her back and—in violation of NYPD guidelines—was not secured with a seatbelt. The van had two benches along the rear interior sides, a metal partition separating the rear from the front, and no windows in the rear. The van then left the scene, with Detectives Truscelli and Stefopoulos in the front. Detectives Luppino and Brooks did not travel in the van.

Plaintiff was driven around in the back of the van for approximately two and a half hours by Detectives Truscelli and Stefopoulos. Throughout this time, plaintiff was yelling to them to

---

[2] Plaintiff's affidavit describes this search as fondling her breasts, buttocks, and vaginal area. (Ex. E to Pl.'s Decl. ¶ 6.) This is the first of the two allegations in the affidavit which contract the deposition and are not considered. At her deposition, plaintiff testified as follows:

Q: When you said he searched your front pocket, the front pocket of your jacket or of your pants?
A: The pants and jacket. He put his hands physically on my leg, and I didn't approve of that. (Exhibit W to Lichterman Reply Decl. at 58:16–20.)

Q: Then he told you he was calling females to the scene to do a more thorough search?
A: No. He didn't tell me anything. He just said, stay right here, and that's when he got on the phone with the other person. That's when they pulled up.

Q: When the additional officers came to the scene, the females searched you?
A: Yes. (*Id.* at 59:4–11.)

[3] Stefopoulos is now a Sergeant and is named as a Sergeant in the caption of this case, but was a Detective at the time of plaintiff's arrest and will be referred to as a Detective throughout.

3

slow down, and shouted that she was not wearing a seatbelt. At one point she asked to use a restroom and was told no, and to be quiet. Detectives Truscelli and Stefopoulos received a radio transmission about an individual who had fled an attempted arrest and caused a collision with other vehicles, including an NYPD vehicle. They accelerated quickly and drove to the location. Plaintiff began kicking the partition with her legs in an effort to object to the van speeding up while she was unsecured in the back of the van. She then positioned herself in a corner of the van so she would not be thrown around the van.

The van was not involved in a collision, but it did come to a sudden stop when it arrived on the scene. Plaintiff fell and hit her head, shoulder, and knee. She lost consciousness, and, while she does not know how long she was unconscious, she estimates it to have been approximately ten minutes. When she regained consciousness, she began kicking the rear door of the van. She had pain in her head, neck, lower back, and knees, but does not know if she had any visible injuries. She had soiled her pants when she passed out because she had been denied permission to use the restroom earlier. A police officer opened the door and said, "Dude, you have a perp in the back of the van." An unidentified officer responded, in a terrified voice, "Oh, shit. I forgot she was back there."

The officer who had opened the door asked plaintiff if she was all right, and plaintiff responded "no," and indicated that her head and back hurt badly. She was crying. The officer helped her out of the van, and she was able to walk without assistance. An ambulance was already on the scene, and she asked a non-party officer for medical treatment. This was her first request for medical treatment. She was told that she had to wait, because police officers were being treated first. Plaintiff was told to sit on the ground. After sitting on the ground for a time in soiled pants,

she was placed back in the van, again without a seatbelt, and taken to the 122nd precinct. She did not receive medical attention at the scene, but was told she would receive it at the precinct.

When she reached the precinct, plaintiff made her second request for medical attention when she asked a non-party officer if she could be taken to the hospital. The officer told her that his shift was ending, and he would not transport her. She then saw Detectives Luppino and Brooks arrive, and made her third request for medical treatment, which was her first to any of the defendants in this case. One of them responded that his shift was ending in twenty minutes, and someone from the next shift would help her. Plaintiff was held at the 122nd precinct for several hours, cuffed to a pipe in the same holding area where male prisoners were detained, though not in the same cell. The other prisoners were staring at her breasts and telling her what they wanted to do to her. Plaintiff did not ask any other officers at the 122nd precinct for medical attention because she was, in her words, "over it."[4]

Eventually plaintiff was transported to the 120th precinct, where she spent the remainder of the night. When she arrived at the 120th precinct, she requested medical attention for the fourth time, from a non-party female officer. The officer responded that no officers were available to transport her to the hospital. Plaintiff was never taken to the hospital. In the morning, plaintiff was taken to the courthouse for her arraignment. She did not ask for medical attention while in court because she felt she could wait until after her arraignment to seek treatment.

---

[4] This is the second area of conflict between plaintiff's deposition and her affidavit, which states, that while cuffed to the pipe, she "begged to be taken to the hospital, as tears flowed down my face, but the officer kept ignoring my request." (Ex. E to Pl.'s Decl. ¶ 27.) This is in direct conflict with her deposition testimony and is therefore not considered. At her deposition, she testified:

Q: At some point, did you ask any other officers for medical treatment?

A: No. After I was denied medical treatment three times from three multiple different officers, I gave up. I was over it." (Exhibit A to Lichterman Decl. at 98:16–20.)

Plaintiff was released after her arraignment and went to Richmond University Medical Center for treatment. She complained of pain in her head, neck, back, and knees. X-rays of her knees and her lumbar spine were negative, as was a CT scan of her head and cervical spine. Plaintiff received treatment for contusions on her knees and a cervical/lumbar strain. She was prescribed pain medication and a muscle relaxer and was released. She sought follow-up treatment with a chiropractor on November 18, 2014, and was treated for less than one week.

## II. Summary Judgment Standard

Defendants are entitled to summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Ind. Co., LTD. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

In determining whether to grant summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

### III. Discussion of Plaintiff's § 1983 Claims

Section 1983 provides a civil claim for damages against any person who, acting under color of state law, deprives another of any rights, privileges, or immunities secured by the Constitution or the laws of the United States. 42 U.S.C. § 1983; *Blessing v. Freestone*, 520 U.S. 329, 340 (1997); *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). There is no dispute that defendants were acting under color of state law.

#### A. Plaintiff's Due Process Claims

Plaintiff claims that, while her arrest was lawful, the conditions of her confinement after arrest deprived her of her constitutional rights. "A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). This is because "pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Id.* (internal citation and quotation marks omitted).

There are two prongs to this claim. First, the plaintiff must show that the challenged conditions of confinement were "sufficiently serious to constitute objective deprivations of the right to due process;" second, the plaintiff must show that the defendant "acted with at least deliberate indifference to the challenged conditions." *Id.* To satisfy the second prong, the plaintiff must show "that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the

7

pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35. "In other words," the Circuit clarified in *Darnell*, "the 'subjective prong' (or '*mens rea* prong') of a deliberate indifference claim is defined objectively." *Id.* The *mens rea* required is greater than mere negligence—a detainee must prove that an official acted intentionally or recklessly, not merely negligently. *Id.* at 36.

In order to constitute a sufficiently serious deprivation under the first prong of the test, the conditions of confinement, "either alone or in combination, [must] pose an unreasonable risk of serious damage to [the detainee's] health." *Id.* at 30. The "conditions themselves must be evaluated in light of contemporary standards of decency." *Id.* (internal citation and quotation marks omitted). The Second Circuit has held that detainees "may not be deprived of their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health." *Id.* (internal citation and quotation marks omitted). Here, plaintiff alleges that she was deprived of access to two of those basic human needs—reasonable safety, when she was left unsecured and handcuffed in the back of the van; and medical care, which she was denied while in custody. I will address the two claims separately.

### 1. *Deliberate Indifference to Safety*

Under the first prong of the test, plaintiff must show that the condition—speeding to the scene of an emergency, while plaintiff was handcuffed behind her back and unseatbelted in the rear of the van—was sufficiently serious to impose an unreasonable risk to plaintiff's health. Defendants rely on *Jabbar v. Fischer*, 683 F.3d 54, 58 (2d Cir. 2012), to show that the fact that plaintiff was handcuffed and unseatbelted, without more, was not a constitutional violation. Defendants also rely on *Carrasquillo v. City of New York*, 324 F. Supp.2d 428, 436 (S.D.N.Y.

2004), to show that negligent driving while transporting a handcuffed and unseatbelted inmate does not violate the Constitution either. Defendants ignore that there is much more to this case. *See Cuffee v. City of New York*, 2017 WL 1232737, at *7 (S.D.N.Y. Mar. 3, 2017), *report and recommendation adopted*, 2017 WL 1134768 (Mar. 27, 2017) (an "in-custody plaintiff injured during transport may . . . state a deliberate-indifference claim if he or she alleges facts in addition to the absence of seatbelts and reckless driving, that, taken as a whole, suggest that the plaintiff was exposed to conditions posing an unreasonable risk of serious harm, and that defendants were aware of those conditions.").

Here, plaintiff offers facts from which it reasonably can be inferred that the officers recklessly disregarded her safety by failing to secure her with a seatbelt, failing to respond to her protests that she had no seatbelt, and by making a conscious choice to drive at high speed to an emergency situation, knowing that plaintiff was at risk of injury in the back of the van. *Id.* at *8 (the driver's "alleged act of driving recklessly, while plaintiff was confined in a cage without any reasonable means to protect [herself] from impact, would satisfy the objective prong of the deliberate-indifference test."). Plaintiff testified that the distance from the back of the van to the partition was two to three feet. The benches and the partition between the back and the front were metal and the doors were locked. Plaintiff was handcuffed behind her back, as opposed to handcuffed and shackled like the plaintiff in *Cuffee*, but I am unpersuaded by defendants' argument that plaintiff's theoretical ability to brace herself with her feet means that she was not at risk of serious injury. Moreover, given that plaintiff had been kicking at the partition to protest her lack of a seatbelt, it is reasonable to infer that both officers in the front of the van knew or should have known of the excessive risk to plaintiff's safety, thereby satisfying the subjective prong of the test.

In both *Carrasquillo*, 324 F. Supp.2d at 347, and *Jabbar*, 683 F.3d at 58, upon which defendants rely, the plaintiffs were inmates being transported on buses that were not equipped with seatbelts, because inmates, "even handcuffed or otherwise restrained, could use seatbelts as weapons to harm officers, other passengers, or themselves." *Jabbar*, 683 F.3d at 58. Here, such a rationale is inapplicable because there were no other occupants in the rear of the van, the van was already equipped with seatbelts, and NYPD guidelines require handcuffed arrestees to be secured with seatbelts. Additionally, plaintiff was not on a bus. A bus transporting inmates would not be required to quickly respond to the scene of an emergency the way the prisoner van was in this case.[5]

However, not all five defendants can be held liable. Even if all defendants were responsible for placing plaintiff in the van without a seatbelt, as discussed above, the lack of a seatbelt, standing alone, is not sufficient to establish a violation of Due Process. Only Detectives Stefopoulos and Truscelli were in the van, and therefore only they were responsible for ignoring plaintiff's repeated requests for a seatbelt and for the decision to drive at a high speed to the scene of an emergency.[6] With respect to the Due Process claims for deliberate indifference to plaintiff's safety against defendants Luppino, Bruno, and Brooks, I grant defendants' motion for summary judgment.

---

[5] Plaintiff also argues that *Jabbar* is inapplicable because it dealt with convicted inmates, not pretrial detainees. Plaintiff is correct that *Jabbar* addressed inmates, to which the Eighth Amendment, and not the Due Process Clause apply, but the Circuit nevertheless rejected the argument as to the Fourteenth Amendment as well as the Eighth Amendment. *Id.* at 58 ("under the Fourteenth Amendment, failure to provide an inmate with a seatbelt does not violate the Due Process Clause because it does not constitute a deprivation of life, liberty, or property").

[6] The driver of the van would be directly responsible and the passenger could potentially be liable on a failure to intervene theory. It is not clear from the parties' submissions who was driving and who was the passenger. Plaintiff's unnumbered "Counterstatement of Facts" states that Luppino was driving and Brooks was in the passenger seat, and cites to Luppino's deposition at page 17. The cited page, however, does not state who was driving and who was in the passenger seat. It is not necessary to resolve this at this stage, as the claim can proceed against both.

## 2. *Deliberate Indifference to Medical Needs*

To satisfy the objective element of a deliberate indifference to medical needs claim, plaintiff must show that she suffered from a serious medical condition, which is defined as "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005). Factors to be considered are whether the condition is one that "a reasonable doctor or patient would find important and worthy of comment or treatment;" whether the condition "significantly affects an individual's daily activities;" "the existence of chronic and substantial pain, or the absence of adverse medical effects or demonstrable physical injury." *Edmonds v. Cent. N.Y. Psychiatric Ctr.*, 2011 WL 3809913, at *4 (S.D.N.Y. Aug. 25, 2011); *accord Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

Plaintiff's claim fails to meet this objective standard. While a loss of consciousness is certainly consistent with an objectively serious medical injury such as a concussion or traumatic brain injury, plaintiff did not in fact have any such injury. The "question raised by the objective prong of the deliberate indifference test is whether the alleged harm (such as heart damage) is sufficiently serious (which it undoubtedly is), rather than whether the symptoms displayed to the [state] employee are sufficiently serious." *Mata v. Saiz*, 427 F.3d 745, 753 (10th Cir. 2005). For example, chest pains are a symptom of a heart attack, which would be a very serious medical condition. But chest pains themselves do not constitute a serious medical condition for which defendants could be liable for denying medical treatment under the Due Process Clause. *Corsini v. Brodsky*, 2015 WL 3456781, at *7 (S.D.N.Y. May 27, 2015) (collecting cases); *see also Hutchinson v. Civitella*, 2003 WL 22056997 at *5 (S.D.N.Y. Sept. 4, 2003).

Here, plaintiff went to the hospital a day after the incident after being released from her arraignment, and her CT scan and X-rays were negative. Her complaints of pain and contusions

are insufficient to establish the objective element of this claim. *See, e.g., Lewis v. Cavanaugh*, 685 Fed. Appx. 12, 13–14 (2d Cir. 2017) (Lewis failed to show a condition of urgency by demonstrating "only that [he] reported that his 'head was swollen' and that he was 'dizzy, nauseous,' and 'seeing double'").

Plaintiff, relying on *Willey v. Kirkpatrick*, 801 F.3d 51, 66–68 (2d Cir. 2015), argues that there is no minimum degree of severity in terms of the injury a pre-trial detainee must assert in order to have a § 1983 claim. *Willey* is inapplicable here because the plaintiff in *Willey* was not alleging denial of medical treatment. In *Willey*, plaintiff alleged that prison conditions were unsanitary because he was left in a cell exposed to human waste for over seven days. Plaintiff relies on the Circuit's statement in *Willey* that "serious injury is unequivocally not a necessary element of an Eighth Amendment Claim." *Id.* Plaintiff takes this single clause out of context. The district court in *Willey* had erroneously dismissed the claim because plaintiff did not "claim that he suffered sickness or other ill effects" as a result of the exposure. *Id.* The Circuit was indicating that the "injury" was the prolonged exposure to human waste, which offended basic notions of human dignity. A plaintiff alleging deprivation of medical treatment, however, is required to show that the deprivation of medical treatment posed an unreasonable risk to her health, which means she is required to show that the condition for which she was denied treatment was sufficiently serious. She has failed to do so. Defendants' motion for summary judgment as to this claim is granted.

B. **The New York City Human Rights Law Claim**

Insofar as relevant here, Section 8-107(4)(a)(1)(a) of the New York City Administrative Code, which is a part of the New York City Human Rights Law, prohibits a provider of a public accommodation, including a government agency or employee thereof, from denying any person

"the full and equal enjoyment, on equal terms and conditions," of that public accommodation because of that person's race. Defendants do not argue that conditions imposed upon an arrestee are not public accommodations. Defendants focus only on "because of race," arguing that plaintiff has "failed to adduce even a scintilla of evidence to show that any of the Defendants had a discriminatory motive in any of their interactions with her." (Defs.' Mem. p. 18.)

As an initial matter, defendants are incorrect about the evidence. Plaintiff alleges in her affidavit that, after plaintiff was searched and handcuffed, she told her cousin to call her mother. One of the arresting officers (either Detective Luppino or Detective Brooks) yelled at her cousin that if she tells anyone he will place her little black ass in cuffs and drag her little ass to jail. (Exhibit E to Pl.'s Decl. in Opp. at ¶ 8.) While not directed at plaintiff, this statement is evidence that the defendant who said it saw plaintiff's cousin not as a 14-year-old girl, but as a black 14-year-old girl, and perceived that distinction to be relevant in some way. It is a fair inference to draw from such a statement that he saw plaintiff not as a citizen, but as a black citizen, and perceived that distinction to be relevant as well. A jury could reasonably find that that distinction between citizen and black citizen was responsible for her treatment. While Detectives Luppino and Brooks are not responsible for her treatment in the prisoner van or her initial requests for medical treatment, they are accused of denying plaintiff equal enjoyment of the public accommodation of police custody inasmuch as they: (1) ordered her out of her vehicle at gunpoint without a sufficient basis to believe she was armed or dangerous; (2) attempted to deter plaintiff's cousin from calling plaintiff's mother to inform her of the arrest; and (3) had a role in placing her in the van without a seatbelt, in violation of the NYPD patrol guide. Viewing the facts in the light most favorable to plaintiff, a reasonable jury could find that these actions were motivated by

plaintiff's race. Defendants' motion for summary judgment as to defendants Luppino and Brooks is denied.

Detectives Truscelli and Stefopoulos are not alleged to have made any racially-charged statements. Nevertheless, explicit evidence of racial animus, *i.e.*, a racial slur, is not required in order to defeat summary judgment. *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir 2001). "In assessing evidence of discriminatory intent, the court should use an 'expansive approach to the record' because plaintiffs in such suits must often 'rely on the cumulative weight of circumstantial evidence, and a defendant is unlikely to leave a smoking gun.'" *Anderson v. City of New York*, 817 F. Supp.2d 77, 95 (E.D.N.Y. 2011) (quoting *Wong v. Yoo*, 649 F. Supp.2d 34, 69 (E.D.N.Y. 2009)).

Here, there is sufficient circumstantial evidence from which a jury could infer racial animus. Plaintiff testified that Detectives Truscelli and Stefopoulos denied her equal enjoyment of the NYPD's facilities when she was denied: (1) a seatbelt, despite being handcuffed and unable to protect herself; (2) access to a bathroom; and (3) medical attention. A jury could infer that her safety mattered so little to the defendants that they did not bother to simply buckle her seatbelt before driving at high speed, or give her basic medical attention by EMTs who were already at the scene after she was knocked unconscious. Plaintiff describes a fundamental refusal to treat her like a human being, in stark contrast with petty rudeness that can be chalked up to "the decline of civility," and which raises no inference of racial animus. *cf. Lizardo*, 270 F.3d at 102. Plaintiff's alleged mistreatment was sufficiently egregious as to call for an explanation. Detectives Truscelli and Stefopoulos—understandably, as they deny mistreating plaintiff—do not offer any non-discriminatory explanation for her treatment. On the contrary, they insist that they do routinely seatbelt handcuffed arrestees. *Cf. Lizardo*, 270 F.3d at 101–02. Given that she is African-American, that the detectives knew little else about her when they took her into the prisoner van,

and, unlike in *Lizardo*, the record reveals no other reason for her treatment, a jury that believes plaintiff could reasonably conclude that she was treated this way because of her race. Defendants' motion as to Truscelli and Stefopoulos is denied.

With respect to defendant Sergeant Bruno, it does not appear that he was present during the initial stop and arrest at gunpoint, nor was he present in the prisoner van during her transport. Plaintiff's only allegation with respect to him is that he was present when she was placed into the van. On the facts alleged, plaintiff has not established that he personally denied plaintiff equal access to any public accommodation. There is therefore no basis from which a jury could conclude that he intentionally discriminated against plaintiff on the basis of her race. Defendants' motion as to Sergeant Bruno is granted.

## CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment on plaintiff's denial of medical treatment claim is GRANTED. Defendants' motion for summary judgment as to plaintiff's deliberate indifference to safety claim is GRANTED as to defendants Luppino, Brooks, and Bruno but DENIED as to Truscelli and Stefopoulos. Defendants' motion for summary judgment on plaintiff's New York City Human Rights Law claim is GRANTED as to defendant Bruno but DENIED as to the remaining defendants. All claims against him having been dismissed, the Clerk of Court is directed terminate defendant Sergeant Victor Bruno as a party.

The remaining claims are a § 1983 claim for deliberate indifference to plaintiff's safety against defendants Truscelli and Stefopoulos, and a New York City Human Rights Law claim against defendants Brooks, Luppino, Truscelli, and Stefopoulos, as well as the City of New York on a *respondeat superior* theory. The parties are directed to submit a joint pretrial order by May 29, 2018 in accordance with my individual practices. The parties are further directed to file proposed verdict sheets, requests to charge, *voir dire* questions, and any motions *in limine* by June 29, 2018. Responses to any motions *in limine* are to be filed by July 13, 2018. A final pretrial conference and trial date will be set by the Court by separate order.

SO ORDERED.

/s/ Nina Gershon
NINA GERSHON
United States District Judge

Dated: April 26, 2018
Brooklyn, New York